# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **MARY GREEN** | ) | |
| **for RICKY C. GREEN** | ) | |
| **(Deceased)**, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 2:05-0081** |
| **v.** | ) | **Judge Wiseman / Knowles** |
| | ) | |
| **JO ANNE BARNHART,** | ) | |
| **Commissioner of Social Security** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of Social Security which found that Plaintiff was not disabled and which denied Plaintiff Disability Insurance Benefits ("DIB"), as provided under Title II of the Social Security Act ("the Act"). The case is currently pending on Plaintiff's Motion for Judgment on the Administrative Record. Docket Entry No. 11. Defendant has filed a Response, arguing that the decision of the Commissioner was supported by substantial evidence and should be affirmed. Docket Entry No. 20.

For the reasons stated below, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

1

# I.  INTRODUCTION

Plaintiff filed his application for Disability Insurance Benefits on September 13, 2001, alleging that he had been disabled since September 12, 1994,[1] due to "diabetes and a left foot wound."  *See, e.g.,*  Docket Entry No. 9, Attachment ("TR"), pp. 55-57.  Plaintiff's application was denied both initially (TR 35-39) and upon reconsideration (TR 41-42).  Plaintiff subsequently requested (TR 43-44) and received (TR 47-48) a hearing.  Plaintiff's hearing was conducted on April 15, 2003, by Administrative Law Judge ("ALJ") Mack H. Cherry.  TR 485-507.  Plaintiff's wife, Mary Green, and Vocational Expert, Jane Brenton, appeared and testified.[2]  *Id.*

On October 8, 2003, the ALJ issued a decision partially favorable to Plaintiff, finding that Plaintiff was entitled to Supplemental Security Income for the period of time from September 12, 2001, until his death on December 24, 2002, but that for the purposes of Plaintiff's DIB claim, Plaintiff was not disabled under Title II of the Social Security Act and Regulations.  TR 13-22.  Specifically, the ALJ made the following findings of fact:

1.      The claimant met the disability insured status requirements of the Act on June 4, 1998, his **amended** alleged disability onset date, and continued to meet them through December 31, 1998.

2.      The claimant has not engaged in substantial gainful activity since June 4, 1998.

3.      From June 4, 1998 to December 31, 1998, the claimant's

---

[1]Plaintiff later amended his alleged onset date of disability to June 4, 1998.  TR 106.

[2]Plaintiff died on December 24, 2002, and was therefore deceased at the time of his hearing.  TR 68-70.  Mary Green, Plaintiff's wife, became the substitute party.  *Id.*  For all events subsequent to decedent's passing, "Plaintiff" refers to Mary Green as the substitute party.

Case 2:05-cv-00081   Document 21   Filed 09/07/06   Page 2 of 35 PageID #: 71

"severe" impairment was type 2 diabetes mellitus with associated peripheral neuropathy. During that period, he did not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1 to Subpart P of Regulations No. 4.

4.    The claimant's death prior to the hearing precludes a credibility finding.

5.    From June 4, 1998 to December 31, 1998, the claimant could have performed the residual functional capacity described above.

6.    From June 4, 1998 to December 31, 1998, the claimant could not have performed his past relevant work as a sheet metal fabricator and a tool and dye maker.

7.    With a high school education, the claimant was 46 years old, which is defined as a younger individual, when he died.

8.    From June 4, 1998 to December 31, 1998, transferability of skills was immaterial.

9.    Considering his residual functional capacity and vocational factors and using either Rule 202.21 or 202.22 as a framework for decisionmaking from June 4, 1998 to December 31, 1998, a significant number of jobs that the claimant could have performed existed in the regional economy. Examples and numbers of such jobs are given above. Table 2 of Appendix 2 to Subpart P of Regulations No. 4; 20 CFR §404.1569.

10.    From September 12, 2001 to December 24, 2002, the claimant's impairments also included chronic osteomyelitis and a severe Charcot artropathy of the left foot that was eventually amputated below the knee.

11.    From September 12, 2001 to December 24, 2002, the claimant's impairments met the requirements of an impairment listed in Appendix 1 to Subpart P of Regulations No. 4.

12.    From June 4, 1998 to December 31, 1998, the claimant was

not disabled under the Title II of the Social Security Act,
but he was disabled under Title XVI of the Act from
September 12, 2001 to December 24, 2002.

13. The claimant died on December 24, 2002.

TR 20-21 (emphasis original).

On November 10, 2003, Plaintiff timely filed a request for review of the hearing decision.

TR 11-12. On July 7, 2005, the Appeals Council issued a letter declining to review the case (TR

5-7), thereby rendering the decision of the ALJ the final decision of the Commissioner. This

civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g). If the

Commissioner's findings are supported by substantial evidence, based upon the record as a

whole, then these findings are conclusive. *Id.*

## II. REVIEW OF THE RECORD

### A. Medical Evidence

Plaintiff alleges disability due to "diabetes and a left foot wound." TR 55-57.

On July 5, 1995, Plaintiff visited the emergency room at the Cookeville General Hospital

for a spider bite to his scalp and met with Dr. P.K. Jain. TR 333. Plaintiff was diagnosed with

cellulitis of the left half of the scalp and prescribed Motrin, Decadron LA, Keflex, Benadryl

capsules, Kefzol, and Cephalaxin. *Id.* Plaintiff was also given a tetanus shot. *Id.*

On July 7, 1995, Plaintiff was admitted to the Cookeville General Hospital under the care

of Dr. Katherine Bertram for further care regarding the spider bite to his scalp, as well as chest

pain and nausea. TR 109. Plaintiff was given Keflex, IV Decadron, and Ibuprofen. *Id.* While

in the hospital, a CCP was performed which was "significant for glucose of 336," and revealed

that Plaintiff's GGT was 120 and his cholesterol was 210. *Id.* A wound gram stain was

4

performed which showed gram positive cocci and cultures revealed "Staphylococcus aureus that was actually pansensitive." *Id.* Plaintiff was given Unasyn through an IV and oral hypoglycemics. TR 110. Plaintiff was placed on a 1,800 calorie diet, referred to a diabetic instructor, prescribed Glucotrol and Augmentin, and was released on July 9, 1995. *Id.*

Plaintiff met with Dr. Katherine Bertram on July 12, 1995, for a follow-up examination regarding his hospitalization. TR 435. Plaintiff reported "feeling much better." *Id.* Dr. Bertram drained pus from the area of the wound and cleaned it with peroxide. *Id.*

Plaintiff visited Dr. Katherine Bertram again on July 14, 1995, for an assessment of the status of his insect bite. TR 435. Plaintiff was instructed to continue taking antibiotics and was placed on Prednisone. *Id.*

On July 21, 1995, Plaintiff returned to Dr. Katherine Bertram for a follow-up visit regarding his previous spider bite. TR 434. Plaintiff's head was identified as being "much less erythematous." *Id.* Plaintiff was advised to continue taking Duricef and Glucotrol XL. *Id.*

Plaintiff returned to Dr. Katherine Bertram on August 4, 1995, for another follow-up visit concerning his spider bite. TR 434. Dr. Bertram noted that Plaintiff's "lesion on his head ha[d] resolved and he ha[d] no further evidence of cellulitis." *Id.*

Plaintiff returned to Cookeville General Hospital on May 26, 1996, and met with Dr. Phillip Bertram for another spider bite. TR 328. Dr. Bertram diagnosed Plaintiff with a spider bite and diabetes. *Id.* Plaintiff's blood glucose level was 394. *Id.* Dr. Bertram advised Plaintiff to take antibiotics via an IV, but Plaintiff refused hospital admission. *Id.* Plaintiff was prescribed Augmentin. *Id.*

On April 13, 1997, Plaintiff visited the emergency room at the Cookeville Regional

5

Medical Center and met with Dr. Danny Strange for a "pins and needle sensation" in his foot, as well as numbness in his hands.  TR 323.  A chest x-ray and an EKG were performed, both of which returned normal results.  TR 324.  Dr. Strange diagnosed Plaintiff with "paresthesias of the hands and feet" and prescribed Mocronase. *Id.*

On June 5, 1998, Plaintiff was again admitted to the Cookeville Regional Medical Center under the supervision of Dr. Katherine Bertram for a "non healing sore" arising from scraping his toe on the bottom of a swimming pool.  TR 123.  Dr. Bertram noted that Plaintiff had not been to see her since being diagnosed with non insulin dependent diabetes two years prior.  *Id.* An electrolyte test was performed which revealed "slightly elevated Potassium at 5.4" and "elevated glucose at 388." *Id.*  A blood culture was taken which showed an "Agglutinin negative Staph thought to be a contaminant." *Id.*  Dr. Bertram also consulted with Dr. Vaughn Barnard. Dr. Barnard indicated that he felt that Plaintiff should be placed on IV antibiotics and expressed a willingness to treat the problem surgically.  TR 311.  On June 8, 1998, Plaintiff was discharged, placed on sliding scale insulin and a 2,200 calorie per day diet, and prescribed Glucophage, Clindamycin, and Augmentin.  TR 123-124.

On June 12, 1998, Plaintiff again visited Dr. Katherine Bertram regarding his toe injury, complaining that its condition had worsened following his release from the hospital.  TR 427. Dr. Bertram noted that the toe was "erythematous and ha[d] an oozing ulcer." *Id.*  Dr. Bertram advised Plaintiff to soak his toe in Epsom salts four times daily, place Bactroban on it, and separate it from his other toes with gauze.  *Id.*  Dr. Bertram advised Plaintiff to continue taking Glucophage and also prescribed Glucotrol XL.  *Id.*

Plaintiff returned to Dr. Katherine Bertram on June 19, 1998, for an examination of his

6

toe and an evaluation of his sugar levels. TR 427. Dr. Bertram determined that Plaintiff's glucose levels were too high, increased his prescription of Glucotrol, and advised him to continue taking Glucophage. TR 428. Dr. Bertram advised Plaintiff to discontinue taking Augmentin and Clendomycin because they were giving him stomach problems. *Id.*

On June 26, 1998, Plaintiff again visited Dr. Katherine Bertram for problems with his toe and diabetes. TR 428. Dr. Bertram noted that Plaintiff's log of sugar levels showed improvement. *Id.* Dr. Bertram advised Plaintiff to continue taking Suprax. *Id.*

On July 10, 1998, Plaintiff visited with Dr. Jeffrey Herring for a "reassessment of his diabetic foot ulcer." TR 424. Dr. Herring noted that both Plaintiff's foot and diabetes had improved, with his blood sugars staying below 200. *Id.* Dr. Herring advised Plaintiff to continue taking Suprax and to monitor his blood sugars. *Id.* Plaintiff was also advised to visit the Diabetic Center and the opthamologist for blurred vision. *Id.*

On October 9, 1998, Plaintiff visited Dr. Phillip Bertram for another spider bite. TR 425. Plaintiff was prescribed Keflex. *Id.*

Plaintiff was admitted to the Cookeville Medical Center on May 19, 1999, for an abscess in his right groin, type II diabetes, and obesity, and was placed under the supervision of Dr. Katherine Bertram. TR 133. A CT scan of Plaintiff's pelvis was performed which revealed "soft tissue swelling and induration extending from the right inguinal level over the right lateral abdominal wall and buttocks." *Id.* A CMP was performed which indicated that Plaintiff's glucose was 335. *Id.* Plaintiff's cultures revealed klebsiella, methicillin resistant staphylococcus aureus, streptococcus agalactia, and prevotella bivia. *Id.* Plaintiff was given IV antibiotics, pain medication, and sliding scale antibiotics. *Id.* On May 24, 1999, Dr. Vaughn Bernard performed

a procedure to identify the abscess and remove the exudate. TR 137. Plaintiff was discharged on May 27, 1999, and prescribed Rifampin, Prandin, and Zestril. TR 134.

Plaintiff returned to the Cookeville Regional Medical Center every day from May 28, 1999, through June 11, 1999, to have his abscess drained and continue treatment on IV antibiotics. TR 232-306. He was given Vancemycin and Rocephin during each visit. *Id.* Dr. Bernard expressed a concern on June 9, 1999, that by draining the abscess, they were only perpetuating the infection. TR 237. Plaintiff was taken off IV antibiotics and given oral antibiotics. *Id.*

Plaintiff returned to Dr. Katherine Bertram on June 14, 1999, for a follow-up visit regarding his groin abscess. TR 418. Dr. Bertram noted that Dr. Bernard had removed all but one of the drains from Plaintiff's leg. *Id.* She observed that Plaintiff appeared to be improving. *Id.* Dr. Bertram instructed Plaintiff to continue taking Rifampin, Trovan, and Avandia. *Id.*

On July 13, 1999, Plaintiff met with Dr. Katherine Bertram for another follow-up regarding his groin abscess. TR 419-420. Dr. Bertram noted that the wound was in good condition with only a small amount of fluid remaining. *Id.* Plaintiff was advised to begin taking insulin, but he was "not interested." *Id.* Plaintiff was prescribed Clindamycin. *Id.*

On February 16, 2000, Plaintiff visited Dr. Katherine Bertram for a left foot injury caused by jumping out of a trailer. TR 415. Plaintiff reported that his foot did not hurt, but that it swelled at night. *Id.* Dr. Bertram wanted to obtain an x-ray of the foot, but did not do so because it was cost prohibitive. *Id.* She prescribed Keflex. *Id.*

Plaintiff returned to Dr. Katherine Bertram on February 23, 2000, for treatment regarding his left foot injury. TR 416. Dr. Bertram identified Plaintiff's condition as possibly Charcot's

8

disease and referred him to Dr. McKinney. *Id.*

Plaintiff returned to Dr. Katherine Bertram on September 22, 2000.[3] TR 416. Dr. Bertram prescribed Glucotrol XL and Clindanycin. *Id.*

On December 18, 2000, Plaintiff visited the McMinnville office of the Family Foot Center and met with Dr. David Song for the permanent excision of the nail border of his right big toe. TR 154. A procedure was performed to correct the ingrown toenail and Plaintiff was prescribed Silvadene. *Id.*

Plaintiff returned to the Family Foot Center on January 18, 2001, and met with Dr. Song for a follow-up visit regarding his ingrown toenail procedure. TR 153. Plaintiff reported that his "toe [did] not hurt." *Id.* Plaintiff was advised to continue soaking his foot. *Id.*

On June 23, 2001, Plaintiff returned to the Cookeville Regional Medical Center and met with Dr. Katherine Bertram for complaints of a diabetic foot ulcer, diabetic artropathy, diabetic neuropathy, and type II diabetes. TR 156. Plaintiff's "history of medical noncompliance" was noted. *Id.* An ultrasound was performed on Plaintiff's left foot which revealed "biphasic flow extending down into the level of the left posterior tibial artery with no evidence of large vessel arterial occlusion or stenosis." *Id.* An x-ray taken of Plaintiff's foot revealed results consistent with diabetic artropathy and abscess formation. *Id.* A wound culture indicated that Plaintiff had strep viridans E. Coli and enterococcus faecalis. *Id.* Plaintiff's urinalysis indicated elevated glucose and Plaintiff's CMP showed a glucose level of 282. *Id.* Plaintiff was given Humulin, sliding scale insulin, oral antibiotics, oral hypoglycemic medication, and pain medication. *Id.* Plaintiff was also placed on an "Ace Inhibitor," but his condition did not improve. *Id.*

---

[3] The purpose of the visit and treatment rendered are not stated in the Record. TR 416.

9

On July 3, 2001, Plaintiff was transferred from the Cookeville Regional Medical Center to Baptist Hospital for treatment by Dr. Terry Jerkins of a "left mid foot collapse with deep abscess." TR 182. A doppler study was performed which showed adequate arterial profusion. *Id.* X-rays were also performed which showed a "severe collapse of the mid foot." *Id.* Dr. John Keyser opined that "the possibility of [Plaintiff] having a functional foot on which he could walk and mow lawns and be as active as he has been in the past is very dim. . ." *Id.* Dr. Keyser made a surgical incision and drained the abscess. TR 182-183. Dr. Jenkins consulted Dr. Jeffrey L. Herring regarding the possibility of saving the foot or amputating it. TR 184. Dr. Herring indicated that the hope for saving Plaintiff's foot was "guarded" at best. TR 185.

Plaintiff returned to Dr. Katherine Bertram's office on July 30, 2001, and met with Nurse Practitioner Sandy Bailiff for a follow-up examination regarding his diabetes. PTR 409-410. Plaintiff reported that he commonly experienced elevated blood sugar levels that he could not reduce. TR 409. Plaintiff was advised to return to Dr. Jerkins at Baptist Hospital for further care regarding his foot. *Id.* Plaintiff was also prescribed Glucotrol, Avandia, and Zocor. TR 410.

On October 9, 2001, Plaintiff visited the Tennessee Orthopedic Alliance for a follow-up visit with Dr. Jeffery Herring regarding his injured foot. TR 192-193. Dr. Herring performed an x-ray of Plaintiff's left foot which revealed "changes of the midfoot consistent with Charcot artropathy." TR 192. Dr. Herring referred Plaintiff to Nashville Orthopedics and Prosthetics to obtain a custom molded bivalved neuropathic walking boot. TR 192-193.

Plaintiff visited with Dr. Katherine Bertram on October 10, 2001, regarding his foot ulcer and to have his blood sugar checked. TR 403. Dr. Bertram noted that Plaintiff's sugars were then under control. *Id.* Plaintiff was given a flu shot and advised to continue with his previous

10

medications.

On November 6, 2001, Plaintiff was admitted to the Cookeville Regional Medical Center under the supervision of Dr. Katherine Bertram for sepsis which required venous access. TR 228-231. Plaintiff was referred to Dr. Vaughn Barnard who inserted a triple lumen central venous catheter. *Id.*

Plaintiff visited with Nurse Practitioner Sandy Bailiff on November 19, 2001, for a follow-up visit concerning his hospitalization for foot troubles. TR 390. Plaintiff was taken off Glucotrol and instead prescribed Humulin N and Hydrocodone. *Id.* He was provided with samples of Avandia and Zocor and instructed to fax his blood sugar levels to Dr. Bertram's office so that his glucose levels could be adjusted when necessary. *Id.*

Plaintiff returned to the Tennessee Orthopedic Alliance on November 29, 2001, and met with Dr. Jeffrey L. Herring for a follow-up visit concerning his left foot injury. TR 190-191. Dr. Herring performed a physical examination, which indicated a grade IV ulcer, and an x-ray, which indicated the persistence of the Charcot process. TR 190. Dr. Herring indicated that the prognosis for saving Plaintiff's foot was "quite poor," and he opined that a below the knee amputation ("BKA") was the best course of action. *Id.*

On December 4, 2001, a physician from the DDS completed a Physical Residual Functional Capacity Assessment regarding Plaintiff.[4] TR 196-202. The physician opined that Plaintiff retained the capacity to occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk at least 2 hours in an 8-hour workday, and sit for about 6

---

[4] The name of the physician performing the assessment is not apparent from the medical records.

hours in an 8-hour workday. TR 197. The physician further opined that Plaintiff retained an unlimited ability to push and/or pull. *Id.* The physician indicated that Plaintiff occasionally had postural limitations, but had no manipulative, visual, communicative, or environmental limitations. TR 198-200.

On December 28, 2001, Plaintiff visited with Dr. Katherine Bertram regarding his foot problems. TR 384. Dr. Bertram advised Plaintiff to continue taking his then-current medications. *Id.* Dr. Bertram noted that Plaintiff was scheduled to meet with Dr. McKinney to provide more information concerning whether his foot would have to be amputated. *Id.*

Plaintiff visited Dr. James McKinney at Upper Cumberland Orthopedic Surgery on January 8, 2002, for a follow-up examination regarding his "left foot chronic osteomyelitis." TR 362. Dr. McKinney opined that he believed that debridement would be counterproductive and that a below the knee amputation was the "only way to get rid of the infection with any certainty," but Plaintiff was unwilling to consent to such a course of action. *Id.* Dr. McKinney advised Plaintiff to continue taking his medications and changing the wound dressing. *Id.*

On January 28, 2002, Plaintiff returned to Dr. Katherine Bertram's office for a follow-up visit regarding his diabetes. TR 383. Plaintiff provided Dr. Bertram with a list of his blood sugar counts which ranged from 120 to 240. *Id.* On this visit, Plaintiff was again consulted about having his left foot amputated below the knee, which he again opposed. *Id.* Plaintiff's prescriptions for Hydrocodone and Skelaxin were refilled. *Id.*

Plaintiff was scheduled to meet with Dr. Katherine Bertram on February 4, 2002, but did not attend his appointment. TR 381-382. Plaintiff's at-home nurse reported that Plaintiff had been very ill with a blood sugar of 60 and that he had consequently been unable to take his

insulin. TR 381. Plaintiff's nurse also reported that Plaintiff had experienced blood sugar levels as high as 260. *Id.* Dr. Bertram expressed concern that Plaintiff had become septic from his osteomyelitis. TR 382 Plaintiff's reason for failing to make his appointment was that he had to visit the oral surgeon, but he refused to speak with Dr. Bertram when she called him. *Id.*

Plaintiff visited Dr. James McKinney at Upper Cumberland Orthopedic Surgery on February 26, 2002, for a follow-up examination regarding his Charcot left foot. TR 361. Dr. McKinney noted changes in Plaintiff's foot size and shape consistent with advanced Charcot disease. *Id.* Dr. McKinney provided Plaintiff with Vioxx. *Id.*

On March 15, 2002, Plaintiff visited Dr. Katherine Bertram for "a check of his chronic medical problems." TR 377. Dr. Bertram identified Plaintiff's problems as osteomyelitis of the foot, diabetes, obesity, and hyperlipidemia. *Id.* Dr. Bertram prescribed Augmentin for Plaintiff's osteomyelitis and advised Plaintiff to continue taking his then-current medications. *Id.*

On April 19, 2002, Plaintiff visited Dr. Bertram for a follow-up regarding his various medical conditions and complaining of increased discomfort in his foot. TR 378. Dr. Bertram conducted a physical examination and lab tests.[5] *Id.* Dr. Bertram provided Plaintiff with refills of Avandia, Hydrocodone, Skelaxin, and Augmentin. *Id.*

On April 23, 2002, Plaintiff visited Dr. James McKinney at Upper Cumberland Orthopedic Surgery for complications in his left foot that caused it to be red and swollen. TR 357. Dr. McKinney again advised Plaintiff that a below the knee amputation was the proper course of action and Plaintiff agreed. *Id.* Dr. McKinney prescribed Augmentin, Avandia,

_____

[5] The results of these tests are not apparent from the Record.

Hamalog, sliding scale insulin and Humulin. TR 358. An appointment was made to perform the amputation on the following day. TR 357.

On April 24, 2002, Plaintiff was admitted to the Cookeville Regional Medical Center to undergo his scheduled below the knee amputation. TR 205. Plaintiff was fitted with a prosthesis, prescribed Tylox and Atarax, and started physical therapy. *Id.* Plaintiff was discharged on April 26. *Id.*

On May 1, 2002, Plaintiff returned to Dr. James McKinney at Upper Cumberland Orthopedic Surgery because his cast felt loose. TR 352. Dr. McKinney noted that Plaintiff's wound "looked good" and "seem[ed] to be healing nicely." *Id.* Plaintiff was prescribed Tylox for the pain. *Id.*

Plaintiff returned to Upper Cumberland Orthopedic Surgery on May 10, 2002, to have the staples removed from his amputation wound. TR 352. Dr. McKinney noted that "the wound [was] healing nicely." *Id.*

On June 6, 2002, Plaintiff returned to the Cookeville Medical Center and met with Dr. John Minchey for complaints of weakness and numbness. TR 216-222. Plaintiff's glucose level was tested and yielded a result of 230. TR 221. Plaintiff was prescribed sliding scale insulin, Hydrocodone, and Skelaxin. TR 221.

On July 9, 2002, Plaintiff returned to Upper Cumberland Orthopedic Surgery and met with Dr. James McKinney for a follow-up concerning his left below the knee amputation. TR 352. Dr. McKinney noted that Plaintiff was tolerating his condition well, but needed to make sure that the "anterior end of the distal portion of the stump" did not become sore. *Id.* Dr. McKinney noted that Plaintiff would eventually get a permanent prosthesis after he became

14

accustomed to having a prosthesis. *Id.*

Plaintiff visited with Nurse Practitioner Sandy Bailiff on July 19, 2002, for a follow-up related to his "chronic medical conditions." TR 449. Plaintiff's prescriptions for Hydrocodone and Skelaxin were refilled, and he was prescribed Lantus and Avandia. *Id.* A BMP and an HGB A1C were performed.[6]

On July 31, 2002, Dr. Frederic E. Cowden, a DDS physician, completed two Physical Residual Functional Capacity Assessments regarding Plaintiff, the first covering the period from June, 2001, to March, 2002, and the second covering the period from March 2002, to July 31, 2002. TR 335-347. In his assessment covering the period from June 2001, to March 2002, Dr. Cowden opined that Plaintiff retained the capacity to occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for at least 2 hours in an 8 hour workday, and sit for about 6 hours in an 8 hour workday. TR 336. Dr. Cowden further opined that Plaintiff retained an unlimited capacity to push and/or pull. *Id.* Dr. Cowden opined that Plaintiff occasionally had postural limitations, but had no manipulative, visual, communicative, or environmental limitations. TR 337-339.

In his assessment covering the period of April, 2002, to July 31, 2002, Dr. Cowden opined that Plaintiff retained the capacity to occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for about 6 hours in an 8 hour workday, and sit for about 6 hours in an 8 hour workday. TR 342. Dr. Cowden further opined that Plaintiff retained an unlimited capacity to push and/or pull. *Id.* Dr. Cowden opined that Plaintiff occasionally had postural limitations, but had no manipulative, visual, communicative, or environmental

---

[6] The results of these tests are not apparent from Plaintiff's medical records.

15

limitations.  TR342-345.  Dr. Cowden indicated that he had insufficient evidence to determine Plaintiff's level of impairment.  TR 347.

On August 27, 2002, Dr. James D. McKinney completed a Medical Source Statement of Ability to do Work-Related Activities (Physical) form regarding Plaintiff.  TR 349-351.  Dr. McKinney opined that Plaintiff could occasionally lift and/or carry 10 pounds, frequently lift and/or carry less than 10 pounds, and stand and/or walk for at least 2 hours in an 8 hour workday.  TR 349-350.  Dr. McKinney further opined that Plaintiff's sitting was unaffected by his impairment.  TR 350.  Dr. McKinney opined that Plaintiff's ability to push and/or pull was unaffected in his upper extremities, but limited in his lower extremities.  *Id.*  Dr. McKinney indicated that Plaintiff was required to periodically alternate sitting and standing to relieve pain or discomfort and was limited in all postural capacities, but had no manipulative, visual, communicative, or environmental limitations, and that Plaintiff's impairments were not likely to produce "good days" and "bad days."  *Id.*

Plaintiff visited Dr. Katherine Bertram on August 21, 2002, complaining that his right foot was swelling.  TR 442.  Dr. Bertram noted that Plaintiff had some "lower extremity edema from the knee down on the right lower extremity," but no sores on the foot.  *Id.*  Plaintiff was prescribed Maxizide.  *Id.*

On August 21, 2002, Dr. Katherine Bertram also completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) form regarding Plaintiff's condition as of June 4, 1998.  TR 371-373.  Dr. Bertram opined that Plaintiff could not occasionally or frequently lift and/or carry any weight, could stand and/or walk for less than 2 hours in an 8 hour workday, and could sit for about 4 hours in an 8 hour workday.  TR 371-372.  Dr. Bertram also

16

opined that Plaintiff was limited in his lower extremities in his ability to push and/or pull. TR 372. Dr. Bertram further opined that Plaintiff was required to periodically alternate sitting and standing because of his amputated left foot, and that Plaintiff was incapable of even low stress jobs.[7] *Id.* Dr. Bertram indicated that Plaintiff needed to take unscheduled breaks during an 8 hour workday and was likely to be absent more than 4 times per month because he had "good days" and "bad days." *Id.* Dr. Bertram indicated that Plaintiff was completely prevented from performing all postural tasks, was limited in all manipulative capacities, had no visual or communicative limitations, and had several environmental limitations. TR 372-373. Dr. Bertram further indicated: "this patient has permanent disability - not able to work!!" TR 373.

Plaintiff visited with Nurse Practitioner Sandy Bailiff on September 4, 2002, for a follow-up regarding his right foot problems. TR 443. Nurse Practitioner Bailiff noted that Plaintiff's edema had shown "notable improvement." *Id.* She advised Plaintiff to continue taking his medications. *Id.*

On September 23, 2002, Dr. Katherine Bertram completed another Medical Source Statement of Ability to Do Work-Related Activities (Physical) form regarding Plaintiff as his condition was on June 4, 1998. TR 368-370. In this assessment, Dr. Bertram opined that Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for less than 2 hours in an 8 hour workday, and sit for about 4 hours in an 8 hour workday. TR 368-369. She also opined that Plaintiff had limited pushing and/or pulling abilities in his lower extremities. *Id.* Dr. Bertram further opined that Plaintiff was incapable of

---

[7] Although this evaluation states, "Assessment as of 6/4/98," it references Plaintiff's amputation, which did not occur until April 24, 2002.

17

tolerating even "low stress jobs." TR 369. Dr. Bertram indicated that Plaintiff was restricted from performing all postural activities, had no visual or communicative limitations, and had some manipulative and environmental limitations. TR 369-370.

On October 18, 2002, Plaintiff returned to Dr. Katherine Bertram's office and met with Nurse Practitioner Sandy Bailiff for his diabetes and his foot problems. TR 438. Nurse Practitioner Bailiff noted that Plaintiff's blood sugar was more controlled than it had been in the past, but that Plaintiff appeared to be gaining weight. *Id.* She ordered a BMP and an HGBA1C,[8] and prescribed Mavic. *Id.*

Plaintiff returned to Dr. Katherine Bertram on November 21, 2002.[9] TR 438. He was prescribed Skelaxin and Hydrocodone. *Id.*

On December 11, 2002, Plaintiff again returned to Dr. Katherine Bertram for a follow-up regarding his diabetes and other medical problems. TR 439. Plaintiff complained of pain in his stump and Dr. Bertram noted that Plaintiff continued to gain weight. *Id.* She increased Plaintiff's prescription for Mavik and prescribed Neurontin. *Id.*

Plaintiff was taken to the emergency room at the Cookeville Regional Medical Center on December 24, 2002, after his family discovered him unconscious and unresponsive. TR 465-468. CPR was performed, but was unsuccessful, and Plaintiff was pronounced dead on arrival from Atherosclerotic Cardiovascular Disease. TR 68, 468-472.

On December 26, 2002, Dr. Edwin D. Bransome Jr. assessed Plaintiff's condition as it had been during the period from June 4, 1998, through December 31, 1998. TR 473-475. He

_____

[8] The results of these tests are not included in the Record.

[9] The purpose of this visit and any tests performed are not included in the Record.

indicated that Plaintiff had suffered from type II diabetes and diabetic peripheral neuropathy, but that neither of those impairments had met or equaled any "Listing." TR 473-474. Dr. Bransome stated that Plaintiff's medical records indicated that he had been non-compliant with doctors' orders, but Dr. Bransome noted that Plaintiff's physicians' "recommendations" were "inadequate." TR 475.

Also on December 26, 2002, Dr. Bransome completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) form regarding Plaintiff as his condition had been in 1998. TR 476-479. Dr. Bransome opined that Plaintiff could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 10 pounds, and stand and/or walk for less than 2 hours in an 8 hour workday. TR 476-477. Dr. Bransome opined that Plaintiff's ability to sit during a workday was unaffected. *Id.* Dr. Bransome noted that Plaintiff's pushing and/or pulling was unaffected in his upper extremities, but that Plaintiff could not push with his left foot because of an ulcer. TR 477. Dr. Bransome indicated that his conclusions were based upon the medical records of Dr. Katherine Bertram. *Id.* Dr. Bransome opined that Plaintiff occasionally had some postural limitations, but had no manipulative, visual, communicative, or environmental limitations. TR 477-479.

## B.  Testimony of Mary Green, Plaintiff's Wife[10]

Plaintiff was born on October 23, 1956, and had a high school education. TR 489. After Plaintiff's death on December 24, 2002, his wife, Mary Green, became the substitute party and pursued the claim on his behalf. TR 70. Ms. Green testified that Plaintiff no training in high

---

[10]  As has been noted, Plaintiff died on December 24, 2002, before the hearing, and Plaintiff's wife became the substitute party. Accordingly, Ms. Green testified on behalf of Plaintiff at the hearing.

school other than that which he received to become a military police officer. TR 489.

Ms. Green testified that Plaintiff had been in the military for approximately one year and had received a hardship discharge after his mother's death. TR 489 Ms. Green reported that from 1981 to 1992, Plaintiff had worked for Troy Design Enterprises as a tool and dye maker. TR 489-490. Ms. Green testified that she did not know anything further about Plaintiff's activities with Troy Design Company. *Id.*

Ms. Green stated that Plaintiff had worked as a machinist "at various industries" after her family had moved to Tennessee from Michigan. TR 490. Ms. Green testified that Plaintiff had not had any regular employment after that. *Id.* Ms. Green testified that Plaintiff and their son went "into business" cutting lawns and that they cut 4 lawns for about 6 months. *Id.* Ms. Green reported that Plaintiff had to stop cutting lawns following his first hospitalization for a spider bite in 1995. *Id.* Ms. Green noted that, following that hospitalization, Plaintiff did not cut any lawns besides his own and that "sometimes it would take him two days to do that." TR 491.

Regarding Plaintiff's spider bite in 1995, Ms. Green reported that "the poison just didn't seem to agree with him." TR 491. Ms. Green also reported that the doctors discovered that Plaintiff was diabetic during Plaintiff's hospitalization for that spider bite. *Id.* Ms. Green stated that Plaintiff "started taking the diabetic pills and then he just never did get any better." *Id.*

Ms. Green testified that Plaintiff had been bit by brown recluse spiders in both 1995 and 1996. TR 491. Ms. Green reported that, after the spider bites, Plaintiff "sweated a lot," and that Plaintiff's doctors "really wasn't sure if [the sweating] was from the diabetes and the poison in his system." *Id.*

Ms. Green stated that Plaintiff saw Dr. "Kathy Bertram" for treatment of his diabetes

from the time of diagnosis until his death. TR 491. Ms. Green reported that Dr. Bertram had referred Plaintiff to Dr. Vaughn Bernard because "he was a foot specialist." TR 492. Ms. Green testified that Plaintiff had been hospitalized in 1998 because he "had scraped his toe, and it got a big old ulcer on the toe part [and] it looked like half the toe was just rotted off." *Id.* Ms. Green stated that Dr. Bernard had "cut all that out" and had given Plaintiff antibiotics. *Id.* Ms. Green testified that Plaintiff had taken intravenous antibiotics for several weeks and underwent whirlpool treatments, and "it finally got healed up." *Id.* Ms. Green reported that Plaintiff "didn't feel his feet at all." *Id.*

Ms. Green testified that Plaintiff eventually had one of his feet amputated, and that Plaintiff had died of a heart attack in December of 2002. TR 492-493. Ms. Green stated that once Plaintiff had become unable to mow lawns, "most of the time he'd just sit in his chair" and "he didn't do anything but watch TV." TR 493. Ms. Green reported that they would occasionally mow their lawn together and that it would take them 2 days to do so because of Plaintiff's foot injury. *Id.* Ms. Green testified that Plaintiff's "foot was always swollen so he'd cut for 30-40 minutes and quit and rest a while." *Id.* Ms. Green stated that when Plaintiff would cut the lawn, "he wouldn't do anything else, he'd be done for the weekend." *Id.* Ms. Green reported that when Plaintiff's foot would start swelling, he would elevate it "for a couple of hours." *Id.* Ms. Green testified that Plaintiff would cook dinner when she worked days, and that that was the only work around the house that Plaintiff would perform. *Id.* Ms. Green stated that Plaintiff did not do the grocery shopping because "he didn't care too much for walking the stores much." TR 494. Ms. Green reported that Plaintiff did not like walking because "his feet would swell, and he could feel the swelling, you know, coming up his leg." *Id.* Ms. Green testified that

21

Plaintiff could stand no more than 15 or 30 minutes at a time. *Id.*

Ms. Green reported that Plaintiff had had trouble sleeping at night, that he would "wake up, ringing wet with sweat," and that his eyes would be blurry for some reason that she did not know. TR 494. Ms. Green stated that Plaintiff "didn't drive much," but that he had taken their son to school on occasion, which was approximately 7 miles each way. TR 494-495. Ms. Green testified that, prior to becoming ill, Plaintiff had "liked to play basketball, and deer hunt," but that he was unable to do either after becoming ill. TR 495. Ms. Green stated that she and Plaintiff "hadn't done a lot in the last . . . eight or nine years." *Id.* Ms. Green testified that, after her surgery in July 2002 for breast cancer, Plaintiff had tried to lift things, but that "he couldn't lift nothing hardly." *Id.*

Ms. Green reported that Plaintiff had had difficulty showering, grooming, and dressing himself, and that, after the amputation of Plaintiff's leg, she had to make sure that he "stay[ed] in the shower long enough." TR 496. Ms. Green reported that Plaintiff did not get out of bed for 9 months at one point. *Id.*

Ms. Green testified that, following his spider bites, Plaintiff complained of aches in his legs, hands and arms that were never explained. TR 496. Ms. Green stated that Plaintiff had tried using pillows and ice packs to alleviate the pain, but that there "wasn't really a whole lot you could do" other than "just pretty much deal with it." *Id.*

Ms. Green reported that Plaintiff had monitored his blood sugar 3 times daily and had kept a record of his totals. TR 496-497. Ms. Green testified that Plaintiff's blood sugar would "run high" when he had an infection and that antibiotics and Plaintiff's diet would cause his blood sugar to fluctuate. TR 497. Ms. Green reported that when Plaintiff's blood sugar ran

22

high, he was switched from sugar pills to insulin and then Plaintiff's blood sugar "stayed pretty much under control." *Id.* Ms. Green stated that Plaintiff's blood sugar had stabilized after he had been placed on 90 cc's of insulin at night and that "it was under control when he passed away." *Id.*

With regard to health problems that "interfered with his ability to work," Ms. Green reported that Plaintiff had had high blood pressure and high cholesterol in addition to diabetes and the spider bites. TR 497-498.

Ms. Green testified that she and Plaintiff had 2 sons, that Plaintiff had had a driver's license, and that Plaintiff had obtained a handicapped parking permit after his leg had been amputated. TR 498. Ms. Green testified that Plaintiff's lawn care business consisted of "mowing the lawns and weed eating around the trees." *Id.* Ms. Green stated that Plaintiff had mowed lawns for approximately 2 years and that he earned about 60 dollars per month doing so.[11] TR 498-499.

Ms. Green testified that she believed Plaintiff had started taking insulin in 2001. TR 499. Ms. Green reported that Plaintiff had been diagnosed as diabetic and prescribed Glucophage in 1995 when he was first bitten by a spider. *Id.* Ms. Green stated that, in addition to Glucophage, Plaintiff had taken Advantage, Zocor, a blood pressure pill, Neurotonin, and Hydrocodone. TR 500. Ms Green reported that she believed the side effects of the medications may have had some connection to Plaintiff's heart attack, but she was not sure. *Id.* Ms. Green testified that there were no day-to-day side effects of Plaintiff's medications, to her knowledge, but she thought that

---

[11] Ms. Green had earlier testified, however, that Plaintiff had mowed lawns for approximately 6 months. *See* TR 490.

Dr. Bertram "had changed his medication about every time he went to the doctor" because the medications were ineffective. *Id.* Ms. Green stated that Plaintiff had also had a problem with sitting because "his back would hurt him and he complained with his hips." *Id.* Ms. Green reported that Plaintiff had used crutches, a walker, and "a little bit of everything to help him take the pressure off his feet" after he got his foot ulcer. TR 501.

Ms. Green testified that Plaintiff did not do any chores around the house aside from cooking dinner and that he had passed most of his time watching television. TR 501. Ms. Green stated that Plaintiff had had to avoid cold weather because "he couldn't handle the cold on his feet" and he had had to avoid the heat because the sugar pills could combine with direct heat to cause a stroke. *Id.* Ms. Green reported that Plaintiff's condition had deteriorated over the course of 2002 to the point that "he couldn't make it up to the bathroom by himself." TR 502. Ms. Green testified that Plaintiff had "used a urinal jar and a potty chair" when she was not home, but that, when she was home, she would "help him to the bathroom." *Id.* Ms. Green reported that Plaintiff had neither drank nor smoked. *Id.* Ms. Green stated that the family's income had come from her work as a machine operator for Delroe Products. *Id.* Ms. Green testified that it had taken Plaintiff a number of years to file for benefits because "he kept on hoping that he would be able to pick his health back up." TR 503. Ms. Green reported that Plaintiff had never received help from vocational rehabilitation and that he had not learned any other job skills. *Id.*

## C. Vocational Testimony

Vocational Expert ("VE"), Jane Brenton, also testified at Plaintiff's hearing. TR 503-507. With regard to Plaintiff's past relevant work history, the VE stated that Plaintiff's lawn care work was not SGA, but that his work as a tool and die maker was medium and skilled, as

was his work as a sheet metal fabricator.  TR 503-504.

The ALJ presented the VE with a hypothetical situation paralleling that of Plaintiff and asked if the hypothetical claimant would be able to do any of the work that Plaintiff had done in the past.  TR 504.  The VE answered that the hypothetical claimant could not do any transferable work, but that there would be light and sedentary jobs that such a person could perform.  TR 504.  The VE opined that, in the State of Tennessee, there were approximately 9,300 jobs as product inspectors at the light level that would be appropriate for the hypothetical claimant.  TR 505.  In addition to the product inspector positions, the VE testified that, at the light level, there were numerous other positions that would be appropriate for the hypothetical claimant, including at least 22,000 table assembler jobs and 1,000 "breeder" jobs.  *Id.*  The VE further testified that, at the sedentary level, there were 1,200 product inspector jobs, 4,800 table assembler jobs, and 1,000 surveillance system monitor jobs, all of which would be appropriate for the hypothetical claimant. *Id*.

The ALJ modified the hypothetical to "factor in a moderate limitation in concentration, persistence and pace" owed primarily to fatigue and discomfort, as well as restrictions limiting standing and walking to one hour and lifting to 10 pounds frequently or occasionally.  TR 505.  The VE responded that such a Plaintiff would still be able to do the sedentary jobs that she indicated.  *Id.*

The ALJ then asked if the hypothetical claimant would be able to do any work if the limitation on concentration were severe.  TR 505.  The VE responded that there would be no positions for such a claimant.  *Id.*  The VE noted that the jobs that she identified as available did not take foot elevation into account.  TR 506.  The VE indicated that if she assumed Dr.

25

Katherine Bertram's assessment to be correct, there would be no jobs that the hypothetical claimant could perform. *Id.*

### III. CONCLUSIONS OF LAW

#### A. Standards of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). If the Commissioner, however, did not consider the record as a whole, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985)

26

(citing *Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980) (citing *Futernick v. Richardson,* 484 F.2d 647 (6th Cir. 1973))).

In reviewing the decisions of the Commissioner, courts look to four types of evidence: (1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience. *Miracle v. Celebrezze,* 351 F.2d 361, 374 (6th Cir. 1965).

### B.  Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he or she applied.  42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

> (1)  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
>
> (2)  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.
>
> (3)  If the claimant is not working and has a severe impairment, it

27

must be determined whether he or she suffers from one of the "listed" impairments[12] or its equivalent.  If a listing is met or equaled, benefits are owing without further inquiry.

(4)  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations).  By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

(5)  Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

20 C.F.R. §§ 404.1520, 416.920 (footnote added).  *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination.  *Id.*  In such cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony.  *See Varley v. Secretary*,

---

[12]  The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B).

## C. Plaintiff's Statement Of Errors

Plaintiff contends that the ALJ erred (1) in rejecting the opinion of Plaintiff's treating physician, Dr. Katherine Bertram, and (2) in failing to give adequate consideration to Ms. Green's testimony. Docket Entry No. 12. Accordingly, Plaintiff maintains that, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be reversed and benefits awarded, or in the alternative, remanded. *Id.*

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary*, 17 F.3d 171, 176 (6th Cir. 1994). *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994).

29

**1.  Weight Accorded to Opinion of Plaintiff's Treating Physician**

Plaintiff maintains that, because Dr. Bertram was Plaintiff's treating physician, the ALJ erred by discounting Dr. Bertram's evaluation of Plaintiff.  Docket Entry No. 12.

With regard to the evaluation of medical evidence, the Code of Federal Regulations states:

> Regardless of its source, we will evaluate every medical opinion we receive.  Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
> (1)  Examining relationship.  Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
> (2) Treatment relationship.  Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques *and is not inconsistent with the other substantial evidence in your case record*, we will give it controlling weight.  When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(I) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. ...
> (3) Supportability.  The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.  The better an explanation a source provides for an opinion, the more weight we will give that opinion. ...
> (4) Consistency.  Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.
> (5) Specialization.  We generally give more weight to the

30

> opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

20 C.F.R. § 416.927(d) (emphasis added).  *See also* 20 C.F.R. § 404.1527(d).

If the ALJ rejects the opinion of a treating source, he is required to articulate some basis for rejecting the opinion.  *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987).  The Code of Federal Regulations defines a "treating source" as:

> [Y]our own physician, psychologist, or other acceptable medical source who provides you or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you.

20 C.F.R. § 404.1502.

Dr. Katherine Bertram treated Plaintiff for an extensive period of time, a fact that would justify the ALJ's giving greater weight to her opinion than to other opinions.  As the Regulations state, however, the ALJ is not required to give controlling weight to a treating physician's evaluation when that evaluation is inconsistent with other substantial evidence in the record.  *See* 20 C.F.R. § 416.927(d)(2) and 20 C.F.R. § 404.1527(d)(2).  Instead, when there is contradictory evidence, the treating physician's opinion is weighed against the contradictory evidence and the ultimate decision lies with the Commissioner.  *Id.*

In August and September 2002, Dr. Bertram completed Medical Source Statement of Ability to Do Work-Related Activities (Physical) forms regarding Plaintiff, both of which were supposed to evaluate Plaintiff's condition as it was on June 4, 1998.  TR 368-373.  As the ALJ noted in his decision, although the evaluations were to assess Plaintiff's condition as it was in 1998, Dr. Bertram, in her August 21, 2002, evaluation, based her assessment on Plaintiff's severe diabetic neuropathy status post a left below-the-knee amputation, which did not occur

31

until 2002.  TR 371-373.  Accordingly, the ALJ found that Dr. Bertram's assessment was not valid for the relevant period, and he accorded it little weight.  TR 19.

The ALJ, in his decision, mistakenly states that Dr. Bertram again referenced Plaintiff's amputation in her September 23, 2002, evaluation.[13]  TR 19.  Plaintiff argues that this constitutes reversible error.  Docket Entry No. 12.  The ALJ's determination that Plaintiff was not disabled under the meaning of Title II of the Act and Regulations, however, was not predicated on his erroneous belief that Dr. Bertram *again* mentioned Plaintiff's amputation.  As will be discussed in greater detail below, Dr. Bertram's September 2002 evaluation contradicts other evidence of record.  Additionally, while Dr. Bertram's September 2002 evaluation did not mention Plaintiff's amputated leg, it did refer to other medical conditions that had not been reported to be present on or before June 4, 1998, such as difficulty sitting for long periods of time.  TR 368-370.

On December 26, 2002, Dr. Edwin Bransome completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) form regarding Plaintiff.  TR 476-479.  Dr. Bransome's evaluation was based upon Dr. Bertram's own treatment notes regarding Plaintiff (as well as the treatment records of Dr. Vaughn).  TR 477.  Using Dr. Bertram's actual treatment records of Plaintiff during the relevant time period, Dr. Bransome ultimately reached different conclusions in his evaluation than did Dr. Bertram in either of her evaluations.

In rejecting Dr. Bertram's assessments, the ALJ noted:

> The only assessment that reflects the claimant's physical capabilities from June 4, 1998 to December 31, 1998 was from Dr. Bransome, because a careful reading of Dr. Bertram's notes during

---

[13] Although the ALJ reports that Dr. Bertram referenced Plaintiff's amputation in *both* her August and September 2002 evaluations, Dr. Bertram, in fact, only referenced Plaintiff's amputation in her August 2002 evaluation.

that period indicates that her assessments did not actually become valid until well *after* December 31, 1998. As noted before, one of Dr. Bertram's bases for her assessment was for a BKA that took place *nearly four years after* his amended alleged disability onset date, which was the date on which she was asked to assess the claimant's capabilities. (The state agency medical consultants did <u>not</u> evaluate the claimant's impairments from June 4, 1998 to December 31, 1998, so their assessments receive no weight for that time period.) Thus, Dr. Bransome's assessment receives by far the most weight for the period from June 4, 1998 to December 31, 1998. During that period, therefore, the claimant could have performed a light level of work with allowances for the limitations in Exhibit 16F.

TR 19 (emphasis original).

Because the record contains contradictory evidence and the ALJ articulated his reasons for discounting Dr. Bertram's assessments, the Regulations do not mandate that the ALJ accord Dr. Bertram's evaluations controlling weight. Accordingly, Plaintiff's argument fails.

## 2.  The ALJ's Treatment of Mary Green's Testimony

Plaintiff contends that the ALJ erred by failing to give adequate consideration to the testimony of Plaintiff's wife, Ms. Mary Green. Docket Entry No. 12. Referring to Ms. Green's testimony, the ALJ stated in his decision that "the only reference to the period in question was the claimant seeing Dr. Barnard in June 1998." TR 19. Plaintiff argues that the ALJ's statement is erroneous because Ms. Green testified regarding such areas as Plaintiff's activities, conditions, and treatment. Docket Entry No. 12. Plaintiff is correct that other statements made by Ms. Green that do not reference any specific time frame could possibly cover the period in question, but the ALJ's statement is correct in that the only specific reference Ms. Green made to the period in question was the one cited by the ALJ. TR 487-503.

Plaintiff conclusorily argues that the ALJ's statement demonstrates that he failed to give

adequate consideration to Ms. Green's testimony, but Plaintiff has failed to proffer any evidence showing that the ALJ disregarded the effect of the circumstances Ms. Green described during the period in question. In his decision, the ALJ discussed the medical evidence and assessments, and also specifically noted, "At the hearing, Mrs. Green testified about the claimant [*sic*] vocational and medical histories." TR 19.

Moreover, the ALJ's determination that Plaintiff was not entitled to DIB is supported by substantial evidence. As explained above, "substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion," *Her*, 203 F.3d at 389 (*citing Richardson*, 402 U.S. at 401), and has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell,* 105 F.3d at 245 (*citing Consolidated Edison Co.,* 305 U.S. at 229).

The record here is replete with doctors' evaluations, medical assessments, test results, and the like, all of which were properly considered by the ALJ, and all of which constitute "substantial evidence." Additionally, the ALJ's decision demonstrates that he considered the testimonial evidence of Ms. Green and the VE. While it is true that some of the testimony and evidence supports Plaintiff's allegations of disability, it is also true that much of the evidence supports the ALJ's determination that Plaintiff was not entitled to DIB under Title II of the Act and Regulations.

As has been noted, the reviewing court does not substitute its findings for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner*, 745 F.2d at 387. In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the

conclusion reached. *Her*, 203 F.3d at 389 (*citing Key*, 109 F.3d at 273). The ALJ's decision was properly supported by "substantial evidence;" the ALJ's decision, therefore, must stand.

## IV. RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied,* 474 U.S. 1111 (1986).

_____
E. CLIFTON KNOWLES
United States Magistrate Judge

35